FILED
United States Court of Appeals
Tenth Circuit

April 1, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

MYRON C. WORTHON;
ANTHONY MICHAEL ROMERO,

Defendants-Appellants.

Nos. 07-3122 and 07-3123

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 06-CR-10072-JTM)**

---

Rick E. Bailey, Conlee, Schmidt & Emerson, L.L.P., Wichita, Kansas, for Defendant-Appellant, Myron C. Worthon.

Brent I. Anderson, Assistant United States Attorney, (Eric F. Melgren, United States Attorney, and William R. Mott, Special Assistant United States Attorney, with him on the brief) Wichita, Kansas, for Plaintiff-Appellee United States of America in case number 07-3122.

Dwight L. Miller, Topeka, Kansas, for Defendant-Appellant Anthony Michael Romero.

Eric F. Melgren, United States Attorney and Brent I. Anderson, Assistant United States Attorney, District of Kansas, Wichita, Kansas, for Plaintiff-Appellee United States of America in case number 07-3123.

Before **HENRY**, Chief Judge, **TACHA,** and **BRISCOE**, Circuit Judges.[*]

**HENRY**, Chief Judge.

Myron Worthon was driving a silver minivan, traveling with Anthony Michael Romero, who was a passenger in another vehicle, when Kansas state troopers stopped the cars for following other vehicles too closely. After the officers discovered 245 pounds of marijuana in the van Mr. Worthon was driving, Mr. Worthon, Mr. Romero and another co-defendant, Justin Smith, were charged with one count of possession of marijuana with intent to distribute. Mr. Worthon and Mr. Romero each filed a motion to suppress, which the district court denied, and they subsequently conditionally pleaded guilty to the charge. The district court sentenced Mr. Worthon to thirty-seven months' imprisonment, and Mr. Romero to sixty months' imprisonment, each with four years' supervised release.

Mr. Worthon and Mr. Romero now appeal the district court's denial of the motions to suppress, challenging the stop, detention, and search. We

---

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of appeal in Case No. 07-3123. *See* FED. R. APP. P. 34(f) and 10TH CIR. R. 34.1(G). The case is therefore ordered submitted without oral argument.

consolidate the appeals, and, for the following reasons, we affirm the district court.

## I. BACKGROUND

On March 3, 2006, Timothy Shultz, a deputy with the Finney County, Kansas, Sheriff's Department, was at the Garden City Travel Plaza in Garden City, Kansas. Deputy Shultz was in an unmarked vehicle, and was in plain clothes. At the Travel Plaza, Mr. Worthon drove directly in front of Deputy Shultz in a silver rental minivan bearing New Jersey license plates. A silver Lexus with Arizona license plates driven by Mr. Romero (accompanied by co-defendant Justin Smith) pulled behind the van and began honking its horn. The two vehicles eventually stopped in the parking lot next to each other. The drivers of the two vehicles spoke with each other briefly. Both vehicles left the parking lot together; Mr. Worthon driving the silver minivan, and Mr. Smith driving the silver Lexus, accompanied by Mr. Romero. Deputy Shultz followed. After several turns in and around Garden City, the two vehicles headed east onto U.S. Highway 50, towards Dodge City, Kansas.

Deputy Shultz was able to get the tag numbers of the two vehicles. Deputy Shultz was suspicious that the two vehicles were involved in drug trafficking due to their apparent age disparities, their actions and the vehicles' tags, one being from the northeast part of the United States and

one being from the Southwest.

Deputy Shultz called the local Drug Enforcement Administration (DEA) office about what he had seen, and a DEA agent requested Deputy Shultz to continue following the two vehicles. Troopers with the Kansas Highway Patrol (KHP) were also contacted and given the description of the two vehicles.

Deputy Shultz followed the two vehicles east onto Highway 50, as they continued towards Dodge City. At one point he passed both vehicles, but ended up between the two vehicles in a moving line of traffic. While on Highway 50, the line of traffic, including Deputy Shultz, was traveling at 65 m.p.h.

A large truck in front of the line of traffic was traveling slower than 65 m.p.h., so the whole line of traffic had to slow down. In reaction to the slower pace of traffic caused by the truck, Deputy Shultz slowed down to 55 m.p.h. In the line of vehicles, a couple of cars and the Lexus followed the truck. The Lexus was a few cars in front of Deputy Shultz.

The van driven by Mr. Worthon was directly behind Deputy Shultz. Deputy Shultz estimated that at the point when the two troopers passed him going westbound (Deputy Shultz and the defendants were going eastbound) on Highway 50, the van was within a car length to a car length and a half from the rear of his vehicle, at an approximate speed of 55 m.p.h. Deputy

-4-

Shultz testified that Mr. Worthon appeared to be preparing to pass him at that time.

KHP Trooper Michael A. Racy was on Highway 50 when he was first contacted about this matter by another KHP trooper, who asked Trooper Racy to pay particular attention to a silver minivan bearing New Jersey plates and a silver Lexus with Arizona plates on Highway 50.

Trooper Racy testified that he was advised that DEA had spotted these two vehicles, and he was to stop them if he observed a traffic infraction. While traveling westbound on Highway 50, Trooper Racy began looking for the silver minivan and the Lexus. While traveling westbound, Trooper Racy observed the silver minivan traveling eastbound on Highway 50 following another vehicle too closely. Trooper Racy testified that the silver minivan with New Jersey plates was extremely close to the vehicle in front of it. In fact, according to his testimony, at first glance, Trooper Racy thought the van was being towed by the vehicle in front of it.

Trooper Racy testified that the silver minivan was within a car length of the vehicle in front of it. The silver minivan was traveling at approximately 55 m.p.h. Trooper Racy testified that a safe following distance, in his training and experience, was two seconds. The following distance between the van driven by Mr. Worthon and the vehicle in front of it (Deputy Shultz's vehicle) was under a half-second.

Trooper Racy turned around and caught up to the van. Trooper Racy stopped the van for a violation of Kan. Stat. Ann. § 8-1523(a). Trooper K.J. Miller also stopped the Lexus for following too closely, in violation of Kan. Stat. Ann. § 8-1523(a).

Upon stopping the van, Trooper Racy approached Mr. Worthon, and advised him that the stop was for his following too close. Mr. Worthon also stated that he thought he was too close. Trooper Racy obtained Mr. Worthon's Texas driver's license and the rental papers for the van. The van was owned by Alamo Financing, LLP, a car rental company. Mr. Worthon was not authorized to drive the rental van. The renter, and only authorized driver, was an "Albert Salas."

According to Mr. Worthon, he was going to Georgia to be deployed to Iraq. Mr. Worthon explained that he could not be included on the rental agreement as an authorized driver because he did not have a credit card. However, Trooper Racy testified he saw a "Visa debit, credit card" when Mr. Worthon opened his wallet to get his driver's license. Rec. vol. II, doc. 102, at 13.

KHP Inspector Jantz, who apparently joined the stop in progress, contacted the rental car company, which requested that he take custody of the van if the registered driver was not with it. Trooper Racy went to the van and asked Mr. Worthon to step out. Trooper Racy told him that the van

was being impounded per the wishes of the owner of the vehicle.  Trooper Racy issued Mr. Worthon a warning citation for following too close.

Mr. Worthon asked Trooper Racy if there was a town or a hotel close where he could take his belongings that were in the vehicle.  Trooper Racy replied that he could drive Mr. Worthon to Dodge City.  Trooper Racy asked if the contents of the van were Mr. Worthon's, who replied affirmatively.  The trooper called a tow truck to pick up the rental company's van.

Trooper Racy advised Mr. Worthon that the troopers could put all of his belongings into the patrol vehicle for transport to town.  Mr. Worthon advised Trooper Racy that that was fine with him.

Trooper Racy and Inspector Jantz went up to the passenger side of the van and opened the sliding door.  For officer safety, Trooper Racy began to check one of several military duffle bags for weapons or anything that could hurt the troopers in any way before unloading all of the bags from the van and loading them into his patrol vehicle.  Trooper Racy grabbed one of the bags and could feel a large, hard, square block that he believed from his training and experience to be illegal drugs, given the nature, size, and feel of the block.

In all, thirteen bundles of marijuana were seized from the duffle bags, weighing approximately 245 pounds.  The officers also discovered military uniforms bearing the names of both Mr. Worthon and Mr. Romero inside a

couple of the duffle bags containing the marijuana. In addition, the officers noted that the van had a two-way radio that was set to channel 5. The silver Lexus also had a two-way radio set to channel 5.

At the conclusion of the motion to suppress hearing, the district court found that Mr. Romero lacked standing to challenge the stop of the van and the search of the duffle bags. The district court further held that even if it were to find that standing was not an issue and address the matter on the merits, it would deny the motion.

In its written order, the district court found that the trooper had legitimately stopped Mr. Worthon; the officers seized the van at the request of the rental company because no authorized driver was present; Mr. Worthon had agreed to allow the trooper to drive him to a motel; and, therefore, the trooper and Mr. Worthon would be in close contact for some time. The district court found that under these circumstances, there was a legitimate basis for feeling the duffle bag to protect officer safety. Rec. vol. I, doc. 56, at 6.

## II. DISCUSSION

Mr. Worthon and Mr. Romero raise nearly identical issues on appeal – four challenges to the district court's ruling: (1) the officers deliberately caused Mr. Worthon's traffic violation, rendering the stop unreasonable; (2) the duration and scope of Mr. Worthon's stop were unreasonable, thus

violating the Fourth Amendment; (3) the officers' manipulation and search of the duffle bags was unreasonable; and finally, Mr. Romero contends (4) the district court erred when it found that the purported traffic violation of "following too closely," under Kan. Stat. Ann. § 8-1523(a), occurred.

## 1. The Reasonableness of Mr. Worthon's Stop

### A. Standard of review

In reviewing the district court's denial of a motion to suppress, we review the court's factual findings for clear error and view the evidence in the light most favorable to the government. *See United States v. Patterson*, 472 F.3d 767, 775 (10th Cir. 2006). We review de novo the reasonableness of a search or seizure under the Fourth Amendment. *United States v. Lyons*, 510 F.3d 1225, 1234 (10th Cir. 2007). The credibility of witnesses, the weight accorded to evidence, and the reasonable inferences drawn therefrom fall within the province of the district court. *United States v. Kimoana*, 383 F.3d 1215, 1220 (10th Cir. 2004). "Finally, whether a defendant has standing to challenge a search is . . . subject to de novo review." *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000) (internal quotation marks omitted).

### B. Standing

#### (i) Mr. Worthon

Mr. Worthon has standing to challenge the lawfulness of his own

detention. *See Nava-Ramirez*, 210 F.3d at 1131 ("This court has repeatedly recognized that although a defendant may lack the requisite possessory or ownership interest in a vehicle to directly challenge a search of that vehicle, the defendant may nonetheless contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of the illegal detention.").

(ii) Mr. Romero

The government maintains (and the district court found) that Mr. Romero lacks standing to challenge the stop of the van Mr. Worthon drove, which was a rental vehicle that authorized only Albert Salas as its driver. Mr. Romero argues briefly that he is challenging both his stop and Mr. Worthon's, but his brief focuses almost exclusively on the validity of Mr. Worthon's stop. We conclude that the district court's conclusion that Mr. Romero lacked standing to object to Mr. Worthon's stop was correct. "Fourth Amendment rights are personal, and, therefore, a defendant cannot claim a violation of his Fourth Amendment rights based only on the introduction of evidence procured through an illegal search and seizure of a third person's property or premises." *United States v. DeLuca*, 269 F.3d 1128, 1131 (10th Cir. 2001) (quoting *United States v. Erwin*, 875 F.2d 268, 270 (10th Cir. 1989)) (internal quotation marks omitted).

Absent a possessory or property interest in the vehicle searched,

-10-

"passengers lack standing to challenge vehicle searches." *United States v. Eylicio-Montoya*, 70 F.3d 1158, 1162 (10th Cir. 1995). As indicated, Mr. Romero was not the registered driver of the rental car. He was not even a passenger in the car, who would "have little or no privacy rights in a motor vehicle." *United States v. Martinez*, 983 F.2d 968, 972-73 (10th Cir. 1992). Because Mr. Romero had no possessory or property interest in the van, it is clear that he lacked standing to challenge Trooper Racy's stop of Mr. Worthon. *See also United States v. Jones*, 44 F.3d 860, 871 (10th Cir. 1995) ("[A] defendant in sole possession and control of a car rented by a third party has no standing to challenge a search or seizure of the car.").

C. The officers' stop of the vehicle Mr. Worthon drove was justified.

"Whether a traffic stop is valid . . . turns on whether this particular officer had reasonable suspicion that this particular motorist violated any . . . traffic . . . regulation[]." *United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004) (internal quotation marks omitted). Traffic stops are "seizures" for the purposes of the Fourth Amendment, and as such, must be reasonable under the circumstances. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996).

Kan. Stat. Ann. § 8-1523(a) provides:

The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway.

In challenging his detention, Mr. Worthon argued to the district court that he did not commit the alleged offense, and that the statute sets out a very subjective standard, which lacks any objective justification. This court applying the same Kansas statute has held a stop reasonable when "[n]othing is advanced in the record that demonstrates that [the defendant] was prevented from applying his brakes to maintain a safe interval, or that he was in imminent danger of being rear-ended . . . ." *Vercher*, 358 F.3d at 1262.

The *Vercher* court also held that "in some cases, an officer's observation of a vehicle traveling at a high speed and close distance from the preceding vehicle, while not necessarily sufficient to convict, is sufficient to provide a reasonable suspicion to effectuate a traffic stop." 358 F.3d at 1263. Here, the district court found that, based on the testimony presented at trial, even if Trooper Racy had a subjective motive for wanting to stop Mr. Worthon (and none of the other cars in the line that may have been guilty of the same violation), there was still probable cause for the stop. Rec. vol. I, doc. 53, at 4-5.

On appeal, Mr. Worthon seeks to analogize his case to *United States v.*

*Ochoa*, 4 F. Supp. 2d 1007, 1012 n.4 (D. Kan. 1998), which determined that Ms. Ochoa did not commit a traffic violation because "the court [found] the troopers caused or contributed to causing" the defendant to drift momentarily, for the first and only time, out of her traffic lane. *See also* Worthon's Br. at 14 ("Because the troopers had caused or contributed to the defendant drifting outside her lane of traffic, the district court found there was no violation . . . ."). Mr. Worthon argues that, even though he was following too closely, because Deputy Shultz's slowing down caused the traffic violation, the stop is invalid. Mr. Worthon also suggests that Deputy Shultz's actions amounted to outrageous government conduct. We will address each argument in turn.

(i) The stop was reasonable.

We hold that *Ochoa* is inapposite to this case for four reasons. First, district court opinions have persuasive value only and are not binding as a matter of law. As such, we are unwilling to extend it beyond its unique set of facts.

Second, those facts are quite different than those present here. As the *Ochoa* court stated:

> When Ochoa briefly drifted onto the shoulder, another vehicle was following her too closely with a patrol car maintaining a position directly beside it. A reasonable driver might have been distracted by the commotion and looked to see what was going on, briefly drifting partially onto the shoulder. In fact, in view of Trooper

Rule's testimony which reflects a clear intent to find some reason to pull over both cars, the court must consider the impact of the officers positioning their vehicle beside the Toyota, which may have startled Ochoa into crossing onto the shoulder or committing some other minor traffic violation. The court finds under the facts of this case that Ochoa's single crossing onto the shoulder was not a violation of Kansas law.

4 F. Supp. 2d at 1012.

The court continued in a footnote:

This is not a matter of a pretextual stop, which is no longer an issue in these types of cases. It is a question of whether there was, in fact, a violation. Here the court finds the troopers caused or contributed to causing the drift, which, under the circumstances, does not constitute a violation.

*Id.* n.4 (internal citations omitted).

Here, in contrast, the record does not show that the officer was the cause, in the way that the officer was a "significant factor" in the violation in *Ochoa*. *Id.* at 1011. While Deputy Shultz's slowing down is, perhaps, a "but-for" cause (but for his slowing down, the offense might not have been committed), the district court here found there was no reason why Mr. Worthon could not have slowed down accordingly. When the officer in *Ochoa* moved over into the passing lane alongside the car behind Ms. Ochoa's vehicle, "the patrol car likely was a significant factor in causing [Ms. Ochoa's car's] momentary drift" because the driver "might have been distracted by the commotion and looked to see what was going on." *Id.* at 1011-12. Significantly, in the present case, instead of slowing down to

maintain a safe distance as he could and should have done, with respect to a vehicle in front of him, Mr. Worthon maintained a half-a-second difference between his van and Deputy's Shultz's vehicle, in what appeared to be an attempt to pass.

Third, as the district court in *Ochoa* explained, prior cases from this circuit have held that a single instance of traveling outside one's lane is not a violation of law when attributable to "such factors as the weather, traffic, and road conditions." 4 F. Supp. 2d at 1011 (citing *United States v. Gregory*, 79 F.3d 973, 978 (10th Cir. 1996); *United States v. Dunn*, 133 F.3d 933 (10th Cir. 1998) (Table), 1998 WL 8227). In *Ochoa*, the court analogized the presence of the patrol car, which distracted the driver, to such a condition, and held that the driver's resulting lone instance of traveling outside of the lane was not a violation of the Kansas statute in question. 4 F. Supp. 2d. at 1011-12 & n.4. Because no violation of law occurred, the stop was not supported by reasonable suspicion. *Id.* at 1012-13. In the present case, Mr. Worthon concedes that a violation of law occurred under the language of the statute in question, and that "[t]here is no similar body of case law holding that a single instance of following too closely does not constitute a traffic violation." Worthon's Br. at 16.[2]

_____

[2] Nevertheless Mr. Worthon argues that "[i]n *Ochoa*, the district court found unreasonable a stop for a traffic violation when the officers making

Fourth and finally, the district court here also found the testimony of Trooper Racy and Deputy Shultz to be credible. Deputy Shultz testified that (1) he had no choice but to slow down when a semi-trailer and the line of traffic in front of him did so; and (2) he did not slam on his brakes or do anything to cause Mr. Worthon's van to follow more closely. The district court found that Trooper Racy had probable cause to stop Mr. Worthon for a violation of Kan. Stat. Ann. § 8-1523. It determined that the officer's decision *not* to stop any of the other cars in the same line of traffic was "irrelevant" as this observation merely "reflects that a subjective motivation of the officers was their investigation of potential drug activity." Rec. doc. 44, at 4. Mr. Worthon could have slowed down to avoid committing the violation. Mr. Worthon has not shown any of these determinations to be in error. In light of the facts as found by the district court, which are certainly not clearly erroneous, we agree with the district court that the stop was reasonable.

(ii) There was no outrageous government conduct in this case.

the stop caused or contributed to the driving conduct which allegedly constituted a traffic violation. In this case, the fact that the officer who caused or contributed to the traffic violation was not the same officer who performed the traffic stop should not dictate a different result. The conduct of causing or contributing to the traffic violation should be held to be outrageous conduct making the traffic stop unreasonable." Worthon's Br. at 16-17 (internal citations omitted). We briefly address Mr. Worthon's outrageous government conduct argument in § II(1)(C)(ii), *infra*.

Mr. Worthon attempts to assert the defense of outrageous government conduct on behalf of the officers in this case.

> The relevant inquiry when assessing claims of outrageous government conduct is whether, considering the totality of the circumstances the government's conduct is so shocking, outrageous and intolerable that it offends the universal sense of justice. This court has recognized the defense of outrageous government conduct, but has never rendered a decision upholding such a claim. The absence of any decision by this court upholding such a claim bears testament to its narrow scope. To succeed on an outrageous conduct defense, the defendant must show either (1) excessive government involvement in the creation of the crime, or (2) significant governmental coercion to induce the crime.

*United States v. Garcia*, 411 F.3d 1173, 1181 (10th Cir. 2005) (internal quotation marks, citations, and alterations omitted).

In this case, Mr. Worthon can point only to Deputy Shultz's slowing down as the "but-for" cause of the offense, which does not approach excessive government involvement in the creation of the violation. *See id.* Thus, there is no connection between Deputy Shultz's slowing down and his colleagues' goal, and it cannot be the basis for an outrageous government conduct defense because he did not want to tailgate the "semi" in front of him. This is not "shocking" "to the universal sense of justice." *United States v. Mosley*, 965 F.2d 906, 910 (10th Cir. 1992) (internal quotation marks omitted). Accordingly, we reject Mr. Worthon's suggestion that the defense should certainly apply in this case.

2. The reasonableness of the duration and scope of Mr. Worthon's stop

Next, Mr. Worthon and Mr. Romero challenge the duration of Mr. Worthon's stop, and whether or not the scope of the stop exceeded its investigatory purpose.  As indicated above, Mr. Romero lacks standing to raise this challenge.  Further, the government correctly urges that we not consider these arguments because defendants did not raise them before the district court.

We have applied to Fourth Amendment issues the long held rule that when a party to the litigation fails to raise an issue below, we will not consider it for the first time on appeal unless the party demonstrates that an impediment existed which prevented the party from raising the argument at the trial level.  *United States v. Dewitt*, 946 F.2d 1497, 1499 (10th Cir. 1991); *see also United States v. Rascon*, 922 F.2d 584, 587 (10th Cir. 1990) (defendant waived the issue of the validity of his detention by "failing to raise it at the suppression hearing").  Mr. Worthon and Mr. Romero make no argument as to why they could not have raised this argument before, and we hold that no miscarriage of justice will result if we do not consider it.

3. The reasonableness of the search of the duffle bags

Next, the defendants challenge the physical manipulation and  search of the duffle bags in the van.  The government argues that the defendants lack standing to raise this challenge, and we agree.

In *Martinez*, we held that neither a non-owner driver nor a non-owner

passenger had standing to challenge the officers' search of the *trunk* of a car in which they were traveling. 983 F.2d at 973. We suggested that the defendants might have standing to challenge a search of the luggage stored in the trunk, however. *See id.* ("[G]iven the uncertainty over the ownership of the vehicle, she may have possessed a reasonable expectation of privacy over the contents of the luggage, [but] not over the trunk where the luggage was located."); *see also United States v. Buchner*, 7 F.3d 1149, 1154 (5th Cir. 1993) ("The owner of a suitcase located in another's car may have a legitimate expectation of privacy with respect to the contents of his suitcase.").

Similarly, in *United States v. Edwards*, 242 F.3d 928 (10th Cir. 2001), we reiterated that while such defendants lack standing to challenge a search of these vehicles, they do have standing to challenge a search of their personal belongings within those vehicles. The *Edwards* court held that in deciding whether a search infringed upon protected constitutional rights, we must examine two primary factors: (1) "whether the defendant manifested a subjective expectation of privacy in the area searched," and (2) "whether society would recognize that expectation as objectively reasonable." *Id*. at 936 (internal quotation marks omitted). Since the bags at issue in *Edwards* were closed, stored in the trunk, and contained personal items such as clothing and toiletries, we found that the defendants may have met the

two-prong test above.

Here, the defendants' subjective expectation of privacy is not as well-defined. The bags were not locked, but were in duffle bags in the open compartment of a van. Mr. Worthon maintained that all the contents of the vehicle, which he was unauthorized to drive, were his.

There is no doubt that Mr. Romero lacks standing to challenge the search of the duffle bags. Before the district court, Mr. Romero argued he "clearly had an expectation of privacy in [Mr.] Worthon's vehicle as the *Government is alleging* [Mr.] Romero had personal items that were found in the back of [the] van." Rec. vol. I, doc. 44, at 7 (emphasis added). However, throughout his district court pleadings, Mr. Romero refers to the contents of the van as "Worthon's bags," "Worthon's duffle bag" and "some items that the Government is alleging belonged to Romero." *Id.* at 7, 3, 2. Mr. Romero unquestionably maintained no subjective expectation of privacy over the bags in the van.

Mr. Worthon also lacks standing to challenge the search because unlike in *Edwards*, there was no authorized driver present. Mr. Worthon "'was driving a rented vehicle and was not named on the rental agreement or any other documents, either as the renter or as an authorized driver. [He] made no showing that any arrangement had been made with the rental car company that would have allowed him to drive the car legitimately.'"

-20-

*United States v. Roper*, 918 F.2d 885, 887 (10th Cir. 1990) (quoting *United States v. Obregon*, 748 F.2d 1371, 1374 (10th Cir. 1984)). Because he was not in "lawful possession or custody of the vehicle," *id.* at 888, he can have no "legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143 (1978). Therefore, the district court properly concluded that Mr. Worthon lacked standing to challenge the search.

## III. CONCLUSION

Mr. Romero lacked standing to challenge Mr. Worthon's stop, and both defendants lacked standing to challenge the search of the duffle bags. The officers' stop of Mr. Worthon was justified, and Mr. Worthon waived challenges as to the length and scope of his stop. Accordingly, we AFFIRM the district court's denial of defendants' motions to suppress.